**William B. NEALLEY et al., Claude F. Clement et al.**

**v.**

**Robert A. BROWN (substituted for Elmer W. Campbell) in his capacity as acting Bank Commissioner of the State of Maine.**

Supreme Judicial Court of Maine.

Dec. 2, 1971.

Locke, Campbell & Chapman by Frank G. Chapman, Harry N. Starbranch, Augusta, for plaintiffs.

Clayton N. Howard, Asst. Atty. Gen., Augusta, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK, and ARCHIBALD, JJ.

WERNICK, Justice.

This appeal, in consolidated actions—and taken originally by Elmer W. Campbell, Bank Commissioner of the State of Maine and for whom, after his resignation, Robert A. Brown, Acting Bank Commissioner, has been substituted as party defendant in the actions—seeks review of a decision of a Justice of the Superior Court. The decision overturned rulings of the Bank Commissioner rendered upon two separate applications for certificates of public convenience and advantage as the first steps in the organization of new trust companies to be controlled by a bank holding company.

The Bank Commissioner had denied each application and refused to issue the certificate of public convenience and advantage required under the provisions of 9 M.R.S.A. § 993 to allow the new trust company to become a body corporate. The Bank Commissioner's refusal was predicated on the generalized ground, without further elucidation, that "issuance of said certificate would be a contravention of the banking laws of the State of Maine."

Under authorization of 9 M.R.S.A. § 7, and by procedures specified in Rule 80B M.R.C.P., each ruling of the Bank Commissioner was appealed by the respective plaintiffs to the Superior Court. There, the Bank Commissioner asserted the "contravention of the banking laws of the State" was that each new trust company as proposed to be created and operated under the bank holding company arrangement would be a "branch" of an already existing trust company situated in a county other than "the county of . . . [the] main office or a county adjoining . . . [the] main office" and, therefore, would be in violation of Maine law—9 M.R.S.A. § 1003. Since, with slightly varying facts, the two cases presented the same fundamental issues, they were consolidated and were heard and decided, as consolidated cases, by the Superior Court.

It is the correctness of the Superior Court's reversal of the Bank Commissioner's denials of certificates of public convenience and advantage—(the Superior Court having explicitly avoided any "attempt directly or indirectly to decide the question of public convenience and advantage" as it might involve aspects other than the specific claim by the Bank Commissioner of a violation of the branch banking statute)—which we are to assess in this appeal.

We uphold the Superior Court's reversal of the orders of the Bank Commissioner. We reach this conclusion, however, on reasoning different from that adopted by the Superior Court.

The Superior Court made its determinations on the merits of the Bank Commissioner's rulings. It decided that the Bank Commissioner was in error in each instance in his conclusion that the new trust company would be a "branch" of another already existing trust company.

■ The view upon which we proceed is that the Bank Commissioner's decision was properly reversed by the Superior Court because, under the impact of constitutionally governing federal law, the Bank Commissioner lacked power and jurisdiction to render a decision, purportedly final, in which he predicated a lack of public convenience and advantage upon essential relationships of a bank holding company to new trust companies being established, and to be operated, under bank holding company control. The reasons for our decision will be presented hereinafter in greater detail.

The facts of the cases appear by stipulation of the parties.

Plaintiffs Neally et als have applied to organize a trust company under the banking laws of Maine to be situated in Bangor, County of Penobscot and known as "Depositors Trust Company of Bangor" (hereinafter referred to as "Bangor"). Nine of the incorporators of Bangor were, at the time of filing the application, directors of Depositors Corporation, a business corporation organized under the general laws of Maine and which is a bank holding company registered with the Board of Governors of the Federal Reserve System under the Federal Bank Holding Company Act, 12 U.S.C. §§ 1841–1849.

As a bank holding company, Depositors Corporation owns (inter alia) all of the outstanding stock of an already existing state-chartered trust company, Depositors Trust Company, which has its main office in Augusta, County of Kennebec.

All of the aforementioned nine incorporators of Bangor are directors, and four of them are officers, of Depositors Trust Company; five of them are officers of the bank holding company, Depositors Corporation.

In addition to these nine, there are six [1] other incorporators of Bangor who reside in the Bangor-Brewer area. None is an officer or director of Depositors Trust Company. One, however, owns 100 shares of stock in the bank holding company. Another is personally indebted, and is vice-president of a company which owes money, to Depositors Trust Company.

Eight directors are proposed for Bangor to consist of (a) the five independent incorporators from the Bangor-Brewer area, (b) an incorporator who is a director and office holder of the bank holding company and of Depositors Trust Company, (c) a non-incorporator officer of Depositors Trust Company, and (d) a Bangor area businessman with no relationship to Depositors Trust Company.

The bank holding company, Depositors Corporation, will own approximately 51% of the stock of Bangor. The nine incorporators of Bangor who are directors of Depositors Corporation have agreed to assign their stock subscription rights in Bangor to that bank holding company. The remaining stock will be made available to the public.

Plaintiffs Clement et als are incorporators of a new trust company sought to be organized under Maine banking laws to be located in Portland, County of Cumberland, and to be known as "Depositors Trust Company of Portland" (hereinafter referred to as "Portland"). The relationships are essentially similar to those in the case of Bangor with the following exceptions.

At the time of their application for a certificate of public convenience and advantage all the plaintiffs in the Portland case were directors of the bank holding company, Depositors Corporation, and all but one were directors of Depositors Trust

---

1. Apparently, only five of these six are plaintiffs in this case.

Company. The directors of Portland are proposed to be seven in number consisting of three of the plaintiff-incorporators and four other individuals who hold no offices or directorships in Depositors Trust Company. The bank holding company, Depositors Corporation, will own approximately 51% of the stock of Portland. The incorporators of Portland have agreed to assign to the bank holding company their rights to subscribe to stock in Portland.

The bank holding company, Depositors Corporation, will furnish a list of candidates from which the directors of Bangor and Portland, respectively, will elect a president and chief executive, respectively, of each.

We recognize immediately from these facts, which were those before the Bank Commissioner and upon which his rulings were predicated, that foundational to any reasoning by which the Bank Commissioner could reach the conclusion that the new trust companies, Portland and Bangor, would be "branches" of the already existing trust company, Depositors Trust Company, is the evaluation of the total organizational structure including stock arrangements and acquisitions proposed to occur before, or as an incident of, the commencement of business operations by the new trust companies. This comprehensive plan of original organization and ultimate structures and operation includes, as its central and essential feature, relationships of the trust companies being created to the bank holding company, Depositors Corporation. Indeed, it is precisely and only because of interrelationships in stock ownership, as well as officerships and directorships in common, linking the new trust companies *through the bank holding company* with Depositors Trust Company, that the Bank Commissioner could rationally arrive at a determination that the trust companies proposed to be created would, in substance, be "branches" of the already existing trust company, Depositors Trust Company.

Thus, it is the plan of organization and operation,—insofar as a bank holding company is the essential and dominant factor by which each of the new trust companies will have relationship to the existing trust company, Depositors Trust Company,— which lies at the heart of the Bank Commissioner's decision in each of the cases.

For this reason, the decision of the Supreme Court of the United States in Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co. et al., 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), as a decision regarding the application and legal effect of the Federal Bank Holding Company Act, 12 U.S.C. §§ 1841–1849, is plainly operative and must be held to be here controlling as the supreme law of the land binding on State Courts under the Supremacy Clause of the Constitution of the United States. Article VI, Clause 2.

■ The decision of *Whitney* establishes, as governing principle, that by the enactment of the Federal Bank Holding Company Act (12 U.S.C. §§ 1841–1849, inclusive) Congress reposed *original and exclusive* jurisdiction in the Federal Reserve Board, subject to review only by an appropriate United States Court of Appeals (and by the Supreme Court of the United States as that Court might see fit to enter) to assess and decide the propriety,— including the applicability and effect not only of federal but also of state law,—of any arrangement in which a bank holding company has a critical position of control in the organization and operation of a new trust company.

We consider it to be without distinguishing significance that on its precise facts *Whitney* happened to involve a *national* bank as to which a separate and independent federal statute, the National Bank Act, establishes administrative supervisory authority in the Comptroller of the Currency, 12 U.S.C. § 26, (operative after the national bank comes into existence as a body corporate), as contrasted with the instant case in which a *state-chartered* trust com-

pany is being established and to complete the creation of which, as a body corporate, the State law requires administrative supervisory authority to act by issuance of a certificate of public convenience and advantage.

The immateriality of the organization of the newly created trust company as a state-chartered trust company rather than as a national bank, as well as the irrelevance of whether the supervisory administrative authority, state or federal, to issue a certificate of public convenience or advantage or a certificate to commence business occurs as an incident of the process of creating the corporate entity or after such creation and prior to the commencement of business, are shown by both the language frequently used by the Court in *Whitney* and the substance of the underlying rationale.

Although Mr. Justice Clark in the opinion for the Court had stated that the bank being created was a national bank and further observed that, therefore, the Comptrolled of the Currency became involved with administrative responsibility to issue a certificate of authority before the bank could commence business, these remarks were part of the statement of the facts of the case as they happened to be before the Court. Other language used by the Court throughout the opinion makes overwhelmingly clear that the character of the bank being created, as national rather than state-chartered, as well as the stage at which the national or state administrative supervisory authority is required to enter—(whether after organization of the corporation and prior to the commencement of business or whether during the corporate organizational process itself)—were immaterial to the scope of the decision.

Repeatedly, in *Whitney* Mr. Justice Clark develops the analyses, and states the conclusions, in language which refers generally to *any* new bank and which conjoins, without differentiation, the organizational proc-

ess and the commencement of business. The following excerpts are typical:

"We believe Congress intended the statutory proceedings before the Board to be the sole means by which questions as to the *organization or operation* of a *new bank* by a bank holding company may be tested."

"Admittedly the acquisition of *an existing bank* is exclusively within the jurisdiction of the Board. We know of no persuasive reason for finding a different procedure required where it is a *new bank* that is sought to be *organized and operated* . . .." (p. 419, 85 S.Ct. p. 557) (emphasis supplied)

"We think . . . congressional actions point clearly to the conclusion that it intended that challenges to Board approval of the *organization and operation* of a *new bank* by a bank holding company be pursued solely as provided in the statute." (p. 420, 85 S.Ct. p. 557) (emphasis supplied)

"Opponents of the opening of *a new bank* by a bank holding company must first attack the arrangement before the Board, subject only to review by the Courts of Appeals." (p. 422, 85 S.Ct. p. 558) (emphasis supplied)

"We . . . hold, . . ., that where a bank holding company seeks to open *a new bank* pursuant to a plan of *organization* the propriety of which must, under the Bank Holding Company Act, be determined by the Board, the statutory . . . procedure set out in the Act must be utilized . . .." (p. 423, 85 S.Ct. p. 559) (emphasis supplied)

The irrelevance of the character of the new bank as national or state-chartered, as well as of the time and manner of requisite administrative supervisory action, is further corroborated by the rationale by which the decision in *Whitney* was reached.

The Court in *Whitney* reached its conclusions without reliance upon the *National*

*Bank Act* or the principle of Federal supremacy, and exclusivity, derived from the manner in which Congress had exercised powers to create a system of national banks and to regulate and control the various aspects of their functioning. McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819); Easton v. Iowa, 188 U.S. 220, 23 S.Ct. 288, 47 L.Ed. 452 (1903); First National Bank of Bay City v. Fellows, 244 U.S. 416, 37 S.Ct. 734, 61 L.Ed. 1233 (1917).

The Supreme Court of the United States was thus unconcerned with any function of the Federal Reserve Board or the Comptroller of Currency as provided under the National Bank Act. It relied *solely* upon the structure erected and the objectives sought to be attained by an independent statute, the *National Bank Holding Company Act,* to arrive at the determination that the Federal Reserve Board has *original* and *exclusive* authority to evaluate and decide all questions as to the propriety of a plan in which a bank holding company is a key factor in the organization and control of a new bank.

█ This point is most significant to show (1) the irrelevance of the nature (as national or state-chartered) of the banking corporation to be created and (2) the immateriality of the stage in the total process of corporate organization and commencement of business at which an appropriate administrative supervisory authority is required to be exercised. The reason is that the provisions of the Bank Holding Company Act (originally enacted in 1956) are applicable to the acquisition of ownership and control by a bank holding company of *any bank* already existing, as well as (as elucidated in *Whitney*) *any bank* being newly created under a bank holding company plan in which the bank holding company will be in control of its organization and operation. It is *not* confined to *national* banks. The Federal Bank Holding Company Act thus represents one of the rare instances in which in express terms Congress has (1) explicitly extended the scope of its regulation to *all banks* in the United States, national or state-chartered and (2) has made the specifics of its regulation applicable in the same manner and with the same scope to both national banks and state-chartered banks.[2]

It was with full awareness of this fundamental underlying proposition—that the Bank Holding Company Act applies to both national and state-chartered banking corporations and deals with them in similar manner—that the Supreme Court of the United States in *Whitney* utilized the special features of that Act as the source of its conclusions reposing original and exclusive jurisdiction in the Federal Reserve Board and exclusive reviewing jurisdiction in an appropriate United States Court of Appeals.

This point in itself would be sufficiently cogent to yield the conclusion that the nature of the bank (as state-chartered or national) being created, as well as the time and manner of the exercise of appropriate federal or state administrative supervisory authority, are without significance to the decision, and doctrine, of *Whitney*.

The conclusion becomes the more firmly fixed as we trace, step-by-step, the analysis of the Supreme Court of the United States specifying the features of the Bank Holding Company Act compelling the conclusions reached in *Whitney*.

First, the Court directed attention to the fact that Federal Reserve Board approval

2. As was said by Howard H. Hackley in an extensive Law Review article written by him while he was general counsel of the Board of Governors of the Federal Reserve System: "The one area in which all banks are presently subject to federal regulation for purposes of supervision and regulation rather than credit control is the area of bank holding companies. Under the Bank Holding Company Act of 1956, no bank, whatever its nature, may be acquired by a bank holding company without the prior approval of the Board of Governors of the Federal Reserve System, . . . .." "Our Baffling Banking System", 52 Va.Law Review 565, 592 (1966).

is required under the Bank Holding Company Act not only for bank holding company acquisition of an existing bank already doing business but also for a newly created bank which will be organized and operated under bank holding company ownership or control. In this connection, the Court noted that the Act prescribed a particular method by which the requisite approval (or disapproval) of the Federal Reserve Board is to be reviewed. Review is limited to appeal proceedings in an appropriate United States Court of Appeals and the record made before the Federal Reserve Board will be controlling if supported by substantial evidence. It was on such basis that the Supreme Court of the United States concluded:

". . . Congress intended the statutory proceedings before the Board to be the sole means by which questions as to the organization or operation of a new bank by a bank holding company may be tested." (379 U.S. p. 419, 85 S.Ct. p. 557)

Since this mechanism of decision and review under the Bank Holding Company Act applies in terms to *any bank* (federal or state-chartered) being organized, or acquired, under the control of a bank holding company, it is manifest that this particular rationale of the Supreme Court of the United States in *Whitney* has significance whether the bank being organized, and to be owned or controlled by a bank holding company, is a state-chartered or a national bank, and regardless of the particular time and manner of functioning of the appropriate administrative supervisory authority, state or federal.

Thus, it was obviously correct, as well as pointedly meaningful, that Mr. Justice Clark stated this aspect of the Court's conclusions by utilizing the broad language:

"*a new bank* that is sought to be organized and operated . . ." (p. 419, 85 S.Ct. p. 557) (emphasis supplied)

by a bank holding company rather than language specifically restricting the conclu-

sions to a *national* bank and to the particular method by which the Comptroller of Currency acts, under the National Bank Act, to issue the requisite certificate to do business.

Second, the Court's reference to the legislative history of the Bank Holding Company Act—to clarify that Congress had denied to the Comptroller a veto over the Federal Reserve Board in relation to the approval, or disapproval, of bank holding company arrangements involving national banks—applies with equal force to state-chartered banks and state required administrative supervisory authority. The provisions designed to make the decision of the Comptroller final, rather than that of the Federal Reserve Board, had been accompanied by a simultaneous coordinate provision to make final the decision of the appropriate State supervisory authority, if a state-chartered bank was being acquired or established by a bank holding company. (Section 5 (b) of a bill as shown in 101 Cong.Rec. 8186–8187).

Thus, the important point becomes that veto power over the Federal Reserve Board by the appropriate supervisory authority, federal or state, whose action is required to allow for the organization or commencement of business of *any* (federal or state-chartered) new banking corporation was rejected when the Federal Bank Holding Company Act was ultimately framed. On this basis, the Court's conclusion as to the significance of such denial of veto power— that (1)

". . . Congress decided otherwise, providing instead for review in the courts of appeals based on the facts found by the Board supported by substantial evidence." (p. 420, 85 S.Ct. p. 557)

and (2)

". . . these congressional actions point clearly to the conclusion that it intended that challenges to Board approval . . . be pursued solely as provided in the statute." (p. 420, 85 S.Ct. p. 557)—

obviously covers the situation in which a bank holding company is dominant in the organization and subsequent operation of a new state-chartered banking corporation as well as one federally chartered.

Again, therefore, it was accurate and acutely significant that in this context Mr. Justice Clark described the subject-matter by the words:

> "the *organization and operation* of *a new bank* by a bank holding company . .." (p. 420, 85 S.Ct. p. 557) (emphasis supplied)

The thrust is manifestly to eliminate a differentiation between national and state-chartered banks, as well as the particular manner in which the appropriate supervisory authority might be involved, precisely because the Bank Holding Company Act in terms renders such distinctions immaterial.

Third, the Court in *Whitney* emphasized the structure of the Bank Holding Company Act as

> "a carefully planned and comprehensive method for challenging Board determinations." (p. 420, 85 S.Ct. p. 557)

and added:

> "That action by Congress was designed to permit an agency, expert in banking matters, to explore and pass on the ramifications of a proposed bank holding company arrangement." (p. 420, 85 S.Ct. p. 557)

Further, the Court observed that the question of whether the newly created banking corporation would be, under the bank holding company plan for organization and operation, a "branch" bank,—notwithstanding that it was "organized under a bank holding company arrangement" (p. 421, 85 S.Ct. p. 558)—was precisely the type of question that

> ". . . Congress has committed to the Board, and we hold that the Board should make the determination of the

plan's propriety in the first instance." (p. 421, 85 S.Ct. p. 558)

■ Hence, Congress having enacted a specific statutory scheme for obtaining review and to avoid "unnecessary duplication and conflicting litigation" (p. 422, 85 S.Ct. p. 558) with "different records, applications of different standards and conflicting determinations", (p. 422, 85 S.Ct. p. 558) the Supreme Court of the United States concluded in *Whitney* that the total mechanism of the Bank Holding Company Act is *exclusive*.

The entirety of this rationale applies equally whether the new banking corporation to be owned, or controlled, by a bank holding company is state or federally chartered. The questions raised by state "branch" banking laws precipitate, when bank holding companies are essentially involved in the relationship, not only particular consequences which the state law might impose *after* a bank has been classified as a "branch" of another bank, but also, and most importantly, the *initial* determination of such classification—namely, whether under all the circumstances the newly created bank is properly to be characterized, in the first instance, as a "branch." In this determination state law may enter with a proper role to play. It must be emphasized, however, that federal law likewise enters when a bank holding company is a primary factor in the plan for the organization and operation of a new banking corporation. The Federal Bank Holding Company Act introduces the concept of a "subsidiary" of a bank holding company. There is thus crystalized the need to evaluate and determine issues which deal with the interaction of federal and state law and of the concepts of "chain" or "bank holding company" banking in contradistinction to "branch" banking. Delicate and serious, indeed, is the evaluation of (1) the extent to which these federal and state concepts might, either in general or in the context of a particular situation, be mutually exclusive; and (2) if they are not mutually exclusive but overlapping, the degree by

which in a given situation one aspect might predominate over the other.

The provisions of the Federal Bank Holding Company Act disclosing that the Federal Reserve Board has unique expertise regarding such questions—which induced the Supreme Court of the United States to decide that, therefore, the Federal Reserve Board must have been intended by Congress to act *originally and exclusively* in the resolution of the issues—applies with the same force whether it is a state-chartered banking corporation or a national bank which might be involved in the bank holding company plan of organization and operation. As we have observed repeatedly, the Bank Holding Company Act treats both alike in requiring approval by the Federal Reserve Board. Thus, the special expertise of the Board is mandated whether the bank being established by the bank holding company is national or state-chartered.

If the Maine Bank Commissioner were allowed to make a final decision, reviewable through the State Courts of Maine, on the questions above delineated and in which are intermixed both the federal and state laws—thereby to deny original existence as a corporate body to a new trust company under a plan of organization and operation involving ownership or control of the new trust company by a bank holding company—the Federal Reserve Board would be deprived entirely of the opportunity and power to evaluate and decide the issues. Thus, "the commands of the Congress would be completely frustrated." (379 U.S. p. 423, 85 S.Ct. p. 559) It was precisely to prevent such likelihood that the Court in *Whitney* held the function and jurisdiction of the Federal Reserve Board in the premises to be both original and exclusive.

■ It is clear, then, that this rationale governs when, as in the case at bar, the banking corporation being created is state-chartered and the issues which the State Bank Commissioner purported to decide finally, and thereby to exclude the Federal Reserve Board, were the very problems requiring exploration, interpretation, application and determination of federal as well as state laws in relation to concepts uniquely arising in bank holding company relationships—namely, whether the type of banking which the bank holding company is arranging involves "chain", or "bank holding company affiliate" banking, rather than "branch" banking. It is specifically in this developing area, which involves a sensitive balancing of federal and state policies, that *Whitney* establishes as the choice of Congress that the Federal Reserve Board, subject only to appellate review by a United States Court of Appeals, shall be the original and exclusive arbiter of such questions. The reasons underlying this decision in *Whitney* are equally real and valid regardless of whether the problems arise in relation to bank holding company establishment of new state-chartered banks or national banks.

Counsel for the State Bank Commissioner has argued to us that, in circumstances in which a trust company is being chartered under the laws of the State of Maine, extension of the scope of *Whitney* to deprive the State of Maine and its appropriate authorities of power to interpret, apply and enforce the Maine "branch" banking statute, would render the action of Congress a violation of the Tenth Amendment of the Constitution of the United States under the decision of Hopkins Federal Savings & Loan Association v. Cleary, 296 U.S. 315, 56 S.Ct. 235, 80 L.Ed. 251, 100 A.L.R. 1403 (1935). We reject the contention.

In *Hopkins* Congress had authorized the conversion of an already created state building and loan association into a federal building and loan association without the consent of the State and, indeed, in spite of objections by the State. The Supreme Court of the United States decided that even though Congress might itself have power to create a *federal* building and loan association, the existence of this power is far different from "the power also *to put an end* to corporations *created by the states* and turn them into different corpora-

tions created by the nation." (p. 336 of 296 U.S., p. 240 of 56 S.Ct.) (emphasis supplied) Such action of Congress was held an encroachment upon the powers reserved to the States under the Tenth Amendment of the Constitution of the United States. The reasoning of the Court was:

"The *destruction* of associations *established by a state* [because the state which creates them brings them into existence "in the belief that their creation will advance the common weal" (p. 337, 56 S.Ct. p. 241) and, therefore, ". . . has an interest in preserving their existence, for only thus can they attain the ends of their creation. . . ." (p. 337, 56 S.Ct. p. 241)] is not an exercise of power reasonably necessary for the maintenance by the central government of other associations created by itself in furtherance of kindred ends." (pp. 338, 339, 56 S.Ct. p. 242) (emphasis supplied)

Thus, in *Hopkins* the Supreme Court of the United States had confined its consideration to the *destruction* of state-chartered institutions, without State consent, in relation to a purported justification asserted in terms of the need of Congress to protect loan and building associations which had been federally created. In deciding that such justification failed, the Court expressly stated as a caveat:

"Beyond that we do not go. No question is here as to the scope . . . of the power to regulate transactions affecting interstate or foreign commerce. The effect of these, if they have any, upon the powers reserved by the Constitution to the states or to the people will be considered when the need arises." (p. 343, 56 S.Ct. p. 244)

The following comments, therefore, are sufficient to differentiate *Hopkins* from both *Whitney* and the case at bar.

First, there is a vast difference, in terms of excessive extremism, between action by Congress which *totally destroys* a state-created corporation against the will of a state,—(and in spite of a state's continuing desire to preserve the existence of its creature and thereby continue to have promoted the purposes for which the state had brought it into being)—and a Congressional undertaking to regulate and, as an incident of regulation, to deny to a state a right to abort the embryo of a body corporate, in process of being created under a state law, in circumstances in which Congress has concluded that there are special interests of the federal government, within a limited and confined sphere, which might dictate that the corporate body be permitted to come into existence—i. e., the interests of furthering the development of "chain" banking, or banking through bank holding company affiliates or subsidiaries under carefully devised controls. Here, state action is being foreclosed in a narrow area. It remains within the power of the state to prohibit creation of the new banking corporation on various other grounds of "public convenience and advantage" which are essentially independent of the domain circumscribed by the Federal Bank Holding Company Act for original and exclusive evaluation and approval by the Federal Reserve Board of bank holding company relationships to trust companies being newly organized.

Second, in enacting the Bank Holding Company Act Congress was surely exercising, among others of its relevant powers, its power to regulate interstate commerce. In *Hopkins* the Court had expressly disavowed any operative effect of the Congressional power over interstate commerce, and it was excluded from consideration. In light of the breadth of the powers over interstate commerce which has been constitutionally allowed to Congress (especially since 1935 when *Hopkins* was decided), we need say only that the objective of Congress, which *Whitney* finds manifested in the Bank Holding Company Act,—that the Federal Reserve Board shall be the original and exclusive arbiter, subject to review by a United States Court of Appeals, of questions arising from the organization and operation of a new bank under the con-

trol of a bank holding company—is, as applied to such organization and operation of a state-chartered bank, a reasonable exercise of the power which Congress clearly possesses to regulate interstate commerce.

It is apparent that Congress in the Bank Holding Company Act was concerned with preserving the advantages in interstate commerce derived from "chain" or "bank holding company affiliate" banking. Yet simultaneously, Congress aimed likewise to protect in interstate commerce the benefits which competition among banks produces. Congress, therefore, subjected bank holding company participation in the organization and operation of new banks, or the acquisition of any already existing banking corporation, to scrupulous regulatory control by a highly expert body, the Federal Reserve Board, to prevent monopolistic accumulations of the banking capital available in particular communities, or regions, of the nation.[3]

In this connection we deem it most significant, as showing the irrelevance of the decision of *Hopkins* to the Federal Bank Holding Company Act and its scope in relation to both national and state-chartered banks, that the Supreme Court of the United States, in *Whitney*, (1) drew specifically from the Bank Holding Company Act—a statute which applies with essentially similar contours to state-chartered banks as well as national banks—the conclusion that the Federal Reserve Board had *original and*

*exclusive* jurisdiction over questions raised by the essential relationships involved when bank holding companies are creating new banking corporations to be owned or controlled by them, and (2) reached its conclusions without once mentioning *Hopkins,* or without expressing any caveat that its decision in *Whitney* was to be confined to *national* banks, and, on the contrary, so frequently employed language sufficiently broad to include state-chartered, as well as national, banks.

■ Hence, while the Maine Bank Commissioner had the power and right under the law of Maine generally to decide questions of public convenience and advantage, in a situation, as here, in which the plan before the Bank Commissioner involves questions arising from the essential relationship of the bank holding company to the banking corporation proposed to be in process of creation and controlled by the bank holding company, the Bank Commissioner lacked jurisdiction, because of the impact of the Federal Bank Holding Company Act, to act as he did by making a *final* decision[4] grounded on factors intimately involved in the total relationship of bank holding companies to banking corporations which they own, or control—i.e., whether "chain" or "bank holding company affiliate" banking is involved rather than "branch" banking.

By thus acting, the Bank Commissioner frustrated in the very process of corporate

---

3. Under 12 U.S.C. § 1842(c) (4) and (5) the Bank Holding Company Act, at the time *Whitney* was decided, prescribed as standards which the Federal Reserve Board must consider in granting or withholding its approval: ". . . the convenience, needs and welfare of the communities and the area concerned" as well as "whether or not the effect . . . would be to expand the size and extent of the holding company system involved beyond limits consistent with . . . the public interest."

In 1966 the Act was amended to read more specifically in terms of monopoly, lessening of competition and restraint of trade. See: 12 U.S.C. § 1842(c) (1) and (2).

4. The emphasis here is on the undertaking of the Bank Commissioner to make a *final* decision denying the certificate. If he believes that a violation of state law is involved, the Bank Commissioner should grant the certificate (if there are no other considerations of public convenience and advantage which are properly within his jurisdiction to decide) and accompany it with a warning statement that he will appear before the Federal Reserve Board to recommend disapproval of the plan when the application for approval is filed—as provided in the Federal Bank Holding Company Act, 12 U.S.C. § 1842(b).

organization the power and right of the Federal Reserve Board, as conferred by Congress, in the first instance and with exclusive authority to pass upon the propriety of the bank holding company plan of organization in terms of relevant laws both state and federal.

Under 9 M.R.S.A. § 7, the Superior Court has power to reverse the order of the Bank Commissioner if it "was in excess of statutory authority, . . . or is not supported by substantial evidence in the record." In the present instance the de-

cision of the Superior Court reversing the Commissioner's denial of the certificate of public convenience and advantage in each case is sustained on the basis that the Bank Commissioner acted "in excess of statutory authority" as constitutionally limited.[5] It is unnecessary that we consider other grounds for reversal.

The entry is:

Appeal denied.

All Justices concurring.

5. We have in mind the recent decision of this Court in Marcou v. Federal Trust Company, Me., 268 A.2d 629 (1970). We deem the decision in *Marcou* to be consistent with the decision now being announced.

While it is correct that in *Marcou* all of the stock of the existing banking corporation, Federal Trust Company, was being acquired by a bank holding company, Merrill Bankshares Company, and the acquisition would thus require approval by the Federal Reserve Board, the jurisdiction of Maine Courts was predicated on factors in which the affirmative nature of the acquiring entity as a bank holding company was without significance.

In *Marcou* this Court assumed, without deciding, the validity of the creation of a "phantom" or "interim" bank, Silver Street Trust Company, and of its capability of merging with Federal Trust Company to produce a surviving trust company, Federal Trust Company. The Court held that regardless of such assumed validity of a merger between Silver Street Trust Company and Federal Trust Company the proposed method by which the stock of the survivor, Federal Trust Company, was to be acquired by Merrill Bankshares Company was illegal because stockholders who were unwilling to part with their stock in Federal Trust Company were being forced (by purported

application of the "merger" statute) into an involuntary surrender of their stock through appraisal proceedings, if necessary. It was decided that under Maine law such involuntary divestment of the ownership of stock in a trust company can legally be accomplished only if, and when, the legal entity purporting to acquire the stock is another trust company. In *Marcou* the acquiring entity was other than a trust company and, therefore, the method of acquisition was declared in violation of the law of Maine.

That the acquiring entity in *Marcou* happened, on the adventitious circumstances of the case, to be a bank holding company was thus immaterial to the decision. The important point was what the acquiring corporation *was not* rather than what it was. The decision would have been the same no matter what the nature of the acquiring entity, so long as it was other than a trust company. Thus, for example, should the facts have chanced to involve in Marcou, " . . . any corporation the majority of the shares of which are owned by the United States or by any State, or . . . any partnership . . ."—which by definition are excluded as "bank holding companies" under the Federal Bank Holding Company Act, 12 U.S.C. § 1841(a), (b)—the principle of decision underlying *Marcou* would, nevertheless, have been applicable.