IN RE APPLICATION FOR FORMATION OF THE CLEVELAND
TRUST COMPANY OF LAKE COUNTY.

(No. 73-778—Decided May 22, 1974.)

184

*Mr. William J. Brown,* attorney general, *Mr. Ira O. Kane, Mr. Richard Routman, Mr. William Compton, Messrs. Jones, Day, Cockley & Reavis, Mr. Victor DeMarco, Mr. H. Chapman Rose, Mr. Richard W. Pogue, Mr. Gerald W. Palmer, Messrs. Porter, Stanley, Platt & Arthur, Mr. Lawrence D. Stanley* and *Mr. Michael P. Graney,* for appellants, The Cleveland Trust Company of Painesville and the Superintendent of Banks.

*Mr. Wayne E. Davis, Mr. Timothy E. Levstik, Messrs. Topper, Alloway, Goodman, DeLeone & Duffey* and *Mr. John J. Duffey,* for appellee, The Lake County National Bank of Painesville.

PAUL W. BROWN, J. This appeal presents the court with the task of determining whether the approval given by the Superintendent of Banks for the formation of appellant bank was in accordance with law, and particularly whether the creation of that bank will result in an extension by Cleveland Trust of its current branch banking activity in Lake County in violation of R. C. 1111.03. For reasons hereinafter explained, we conclude that the superintendent's order was lawful, and hold that the Court of Appeals erred in vacating that order.

Our review of the questions of fact and law surrounding the superintendent's order is complicated by the fact that the formation of the bank in question is but one of a series of interrelated steps in a complex corporate reorganization. In considering an application for the formation of a new bank, R. C. 1103.07(B) requires the superintendent to:

"* * * examine all of the facts connected with the formation of such proposed bank to ascertain whether:

"(1) The articles of incorporation * * * and other supporting items required under Chapter 1103 of the Revised Code meet the requirements of Title XI of the Revised Code."

Where the proposed new bank is part of a reorganization, it is clear that neither the superintendent nor a re-

viewing court can confine its inquiry to only one isolated element of the comprehensive plan.

Because R. C. 1103.07(B) specifically ties the entire state banking code into the inquiry, it is worthwhile to note the declaration of legislative purpose in enacting the banking statutes, contained in R. C. 1101.06, that those statutes were enacted in order to:

"(A) * * * delegate to the Division of Banks rule-making power and administrative discretion, subject to such chapters, which will assure that the supervision and regulation of banks chartered under the laws of this state *may be flexible and readily responsive to changes in economic conditions and in banking practices*;

"* * *

"(D) To provide the opportunity for the management of banks *to exercise their business judgment,* subject to the provisions of such chapters:

"(E) To clarify and modernize the laws governing banking." (Emphasis added.)

Thus, the General Assembly clearly recognized that full protection of and service to the banking public could not be accomplished by foreclosing banking institutions from developing and instituting new modes of organization and operation.

The parties have stated their positions unequivocally throughout the several stages of this case. Appellee contends that the plan of reorganization is but a subterfuge undertaken by Cleveland Trust to extend its commercial presence in Lake and Lorain counties in violation of numerous statutory prohibitions, most notably that of R. C. 1111.03 establishing geographic limitations on branch banking. Appellants, on the other hand, have defended the plan as a decision by management to avail itself of an entirely lawful corporate structure which has proven beneficial to banking institutions in Ohio and throughout the nation.

Throughout this controversy numerous issues have been raised by all parties. Of these, there are three the disposition of which must control our decision.

It was asserted by appellee, and so determined by the

Court of Appeals, that the proposed statutory merger between the present Cleveland Trust and Cuyahoga could not lawfully be consummated because R. C. 1121.04 requires that the surviving corporation in such a merger be engaged in actual banking operations.

Appellee asserts further that the transfer of assets and liabilities from the present Cleveland Trust to CT-Painesville (and CT-Lorain) in exchange for the stock of those banks is an investment in one bank by another in violation of R. C. 1107.16 and R. C. 1107.17.

Appellant disputes these two claims, and asserts that the Court of Appeals erred in concluding that the operation of the three new banks, essentially all the shares of which would be held by the bank holding company, Cleve-Trust, would constitute branch banking in contravention of R. C. 1103.14, 1111.03 and 1121.04.

Appellant argues that the Court of Appeals erred in finding that the merger between Cleveland Trust and Cuyahoga would be barred by R. C. 1121.04, since neither the banking statutes nor the general corporate statutes require that the surviving corporation in a merger between two banking corporations be engaged in actual banking operations at the time the merger is consummated. The opinion of the Court of Appeals indicates that it read into R. C. 1121.04 a standard that does not appear in the statute. That statute, which sets forth the requirements for bank mergers, in referring to "state banks" incorporates the definition of that term given in R. C. 1121.01(B): "* * * a bank *organized* under the laws of this state." (Emphasis added.) To read into R. C. 1121.04 a requirement that a bank not only have been formed in accordance with the statutes but that it must already have commenced its commercial activity is an unwarranted interpretation of the statute. That the Court of Appeals took this extra step is evident from its opinion, in which it concluded that:

"* * * In order to amend [the articles of incorporation, which must be filed with the Superintendent of Banks when a merger is sought] a bank must be incorporated and authorized to do, and is in fact doing, business. * * * These

statutory requirements [*i. e.,* those in R. C. 1121.04] strongly suggest that the existence of two operating banks is requisite to a merger.''

We hold that neither R. C. 1121.04 nor the general corporate merger provisions of R. C. 1701.78 require that the resulting corporation in a bank merger be engaged in actual banking operation at the time the merger is to be consummated.

Appellants take issue with the Court of Appeals' conclusion that as a result of the transfer of assets and liabilities to CT-Painesville in exchange for that bank's stock, Cleveland Trust would be investing in the stock of another bank in violation of R. C. 1107.16 and 1107.17. Those statutes enumerate in detail the exclusive types of investments which banks are permitted to make. The Amended Agreement between Cleveland Trust and CT-Painesville specifies that CT-Painesville will issue to Cleveland Trust *or its designee* 6,000 shares of its common stock (less directors' qualifying shares). The Amended Agreement and Plan of Reorganization, to which both Cleveland Trust and CT-Painesville are party, designates CleveTrust as the ultimate holder of CT-Painesville shares, so that at no time will Cleveland Trust be holding that stock for investment. The contrary conclusion to which the Court of Appeals came appears to have its basis in a misunderstanding of the terms of the stock transfer. We hold that where a bank transfers assets and liabilities to another bank, in consideration of which the recipient bank issues substantially all its stock to the transferor bank, and contemporaneously with such issuance the shares are transferred to a holding company to be held on a long-term basis, there has been no investment by one bank in the stock of another such as would violate R. C. 1107.16 or R. C. 1107.17.

Our attention must now turn to appellants' assertion that the Court of Appeals erred in holding that the reorganization would violate the geographic limitations on branch banking, referred to in R. C. 1121.04 (C) and set forth in R. C. 1111.03(A). The ''branching'' question is

clearly pivotal in this case, for if it be concluded that the operation of CT-Painesville (as well as CT-Lorain) would be in substance nothing more than the operation of branch offices by the present Cleveland Trust, then the transfer of assets and liabilities by Cleveland Trust to CT-Painesville would run afoul of R. C. 1121.04(C). The last paragraph of that statute provides that:

"Any consolidation, merger, purchase, corporate reorganization or acquisition, or any other transfer of assets or liabilities under this section shall be subject to the geographic limitations set forth in Section 1111.03 of the Revised Code."

R. C. 1111.03(A) provides that:

"No branch shall be established until the consent of the Superintendent of Banks has been obtained, and no bank shall establish a branch in any place other than that designated in its articles of incorporation as its principal place of business * * *."

If in fact CT-Painesville would be but a branch of Cleveland Trust, then the superintendent would be without authority to approve the formation of the new banks, and the Court of Appeals would be correct in vacating the order of approval. Conversely, if the superintendent properly decided that CT-Painesville would be independent of Cleveland Trust, in fact as well as in form, then the Court of Appeals was in error in vacating his order.

CT-Painesville does not fit into any of the categories defined as a "branch" in R. C. 1101.01(D), and therefore there is no literal violation of the branching statute. If CT-Painesville is to be considered a branch of Cleveland Trust, it must be through interpretations of branching contained in the opinions of other courts which have considered the issue. The distinction between an independent bank and a branch bank is one of fact, but fortunately there is a well recognized general test to guide us. That test was promulgated in *First National Bank in Billings* v. *First Bank Stock Corp.* (C. A. 9, 1962), 306 F. 2d 937, 942, which held that branching existed only where the banks involved were doing business with and through one another as one unit,

regardless of how the arrangement was denominated. Applying this "unitary operation" test in the case before it, the *Billings* court found no branching because, *inter alia*, up to a certain point in time the two banks had but one common director, each was a separate corporation with its own capital, surplus, and undivided profits, each had its own physical facility and its own employees, and no officer, director, employee, or authorized agent of either bank had any such relationship with the other.

The unitary operation test was the basis for further consideration of the branching question by other courts, which elaborated the distinction between branch and independent banking. In *In re Application of Kenilworth State Bank* (1967), 49 N. J. 330, 230 A. 2d 377, the Supreme Court of New Jersey considered a claim that the establishment of a new bank as an "affiliate" of another bank was an evasion of a state statute prohibiting a bank from opening a branch in another municipality in which there was already established another banking institution. Holding that a bank which had separate legal identity, with its own name, location, deposit liabilities, loan limitations, etc., was not a branch, the court cautioned that the fact that such a bank was affiliated with a banking group should not be allowed to blur the distinction between independent and branch banking. Similarly, it was held in *Commercial National Bank of Little Rock* v. *Board of Governors of the Federal Reserve System* (C. A. 8, 1971), 451 F. 2d 86, that the fact that subsidiary banks of a bank holding company would cooperate in the future was not definitive evidence of branch banking, where the facts showed that the banks were not to be operated as a unit. Banking groups of affiliated banks were held not to be engaged in branch banking, again because the facts failed to show unitary operation, by the Supreme Court of Colorado in *Peoples Bank* v. *Banking Board* (1968), 164 Colo. 564, 436 P. 2d 681; *Goldy* v. *Crane* (1968), 167 Colo. 44, 445 P. 2d 212; and *Nemirow* v. *Bloom* (1968), 167 Colo. 42, 445 P. 2d 214, and by the Supreme Court of Utah in *Clearfield State Bank* v. *Brimhall* (1970), 24 Utah 2d 339, 471 P. 2d 161, where, in a con-

curring opinion, it was shown that each of the alleged branches had its own directors, loan limits, capital structure, and other indicia of corporate independence.

Appellee looks for support for its position to the decision of the United States Court of Appeals in *Whitney National Bank in Jefferson Parish* v. *Bank of New Orleans & Trust Co.* (C. A. D. C. 1963), 323 F. 2d 290, reversed on other grounds, 379 U. S. 411. That case involved a plan by which the Whitney National Bank of New Orleans, the state's largest, organized and funded a holding company which acquired the Crescent City National Bank, which was never meant to, and never did, open for business. Whitney thereupon transferred its assets to and consolidated with Crescent City. The new Whitney then furnished the holding company with capital which was used to organize Whitney in Jefferson Parish (adjacent to the parish in which New Orleans is located). All the stock of the holding company was distributed proportionally to the stockholders of the original Whitney. The reorganization was challenged as a violation of a state law establishing geographic limitations on branch banking similar to those now before us. Although the court, in *Whitney*, found that the plan, to which the instant reorganization bears a marked resemblance, did in fact violate the state branching law, the decision is an emphatic affirmation of the unitary operation test. Among the facts which led the court in *Whitney* to conclude that illegal branching was the purpose of the plan were particularly revealing declarations of the intent of management made by the president of Whitney of New Orleans. In a letter to stockholders he explained that: "The basic purpose of the program is to allow * * * [Whitney] to commence a holding company operation controlling a bank in East Jefferson Parish to protect Whitney's competitive position in that area * * *," and further assured them that:

"* * * those [depositors] in the smaller bank will be assured of the same management which directs the larger one without possibility of interruption. They will be assured of access to the large loan limits of the combined

194

banks. They will have the security which arises out of the fact that the large and the small bank have identical ownership as well as management * * *.'' (323 F. 2d 301.)

Those statements provide a concise working definition of "unitary operation." The Board of Governors of the Federal Reserve System[4] had no doubts about the true nature of the Whitney reorganization. It found in its report (cited at 323 F. 2d 302) that:

"* * * for present purposes the holding company itself is simply the means by which Whitney banking offices may be established and operated in East Bank.

"* * *

"* * * The management and policies of the holding company system, it appears, would be equivalent to those of Whitney of New Orleans. * * *''

In *Whitney,* the court found the evidence overwhelming that what was contemplated was a unitary operation, lacking only the formal designation as a branch bank to place the proposed arrangement squarely within the statutory prohibition, and disapproved the plan as a subterfuge to avoid state law.

It is apparent that the unitary operation test is given meaning by careful scrutiny of the facts present in an individual case. In the instant case, the initial factual determinations were made by the hearing examiner after consideration of a voluminous record, and were confirmed in

---

[4]The approval of the Board of Governors of the Federal Reserve Board is required in such holding company reorganizations as this by the Bank Holding Company Act, Section 1841 *et seq.,* Title 12, U. S. Code. The Act specifically requires that such plans be consistent with state law, Section 1846, Title 12, U. S. Code. We share the opinion of the Supreme Court of Tennessee in *Gary* v. *Memphis Bank & Trust Co.* (1973), Civ. No. 77,386, and the Court of Common Pleas below, that it is for the courts of the state to definitely construe such questions of state law as may be involved in the actions of bank holding companies. In doing so, we reject the suggestion of the Supreme Court of Maine in *Nealley* v. *Brown* (1971), 284 A. 2d 480, that the federal authorities to which responsibility is given for all other aspects of the review and approval of proposed holding company reorganizations pass on issues of state law as well.

all respects upon review by the Superintendent of Banks. Those conclusions of fact, for all of which reliable and probative evidence abounds, clearly demonstrate that the indicia of unitary operation between Cleveland Trust and CT-Painesville (as well as CT-Lorain) are absent. The conclusion of the hearing examiner, the superintendent, and the Court of Common Pleas clearly demonstrated that each of the banks has an independent corporate structure, an independent capital structure (the "seed" money allocated by Cleveland Trust to CT-Painesville being the only capital bridge between the two); that the officers and directors of each bank will be separate and independent upon the election of local management immediately following the reorganization; that each will operate from its own physical facilities with its own employees; and that each will pursue its own deposit and loan policies. The Court of Appeals theorizes, in its opinion, that even if complete independence of CT-Painesville be assumed, there will at least be a "flow" of commercial and trust business from it to Cleveland Trust. Such a "flow" may well materialize, for it is common practice for smaller banks to seek correspondent relationships with larger ones, but that cannot be taken as definitive evidence that the banks are therefore operating as one unit. We hold that the facts demonstrate that Cleveland Trust is not engaged in prohibited branch banking through the instrumentality of CT-Painesville, and the fact that they are not strangers to one another cannot be seized upon to imply the contrary.

For the foregoing reasons, it is the judgment of this court that the Superintendent of Banks acted lawfully in approving the application for the formation of CT-Painesville, and that the Court of Appeals erred in vacating the order of approval. We therefore reverse the judgment of the Court of Appeals and reinstate the order of the Superintendent of Banks.

*Judgment reversed.*

O'NEILL, C. J., HERBERT, CORRIGAN, STERN, CELEBREZZE and W. BROWN, JJ., concur.