IN THE MATTER OF APPLICATION OF KENILWORTH STATE BANK FOR A CHARTER FOR A BANK TO BE LOCATED AT 481 BOULEVARD, BOROUGH OF KENILWORTH, COUNTY OF UNION, AND STATE OF NEW JERSEY.

THE NATIONAL STATE BANK, ELIZABETH, NEW JERSEY, APPELLANT, v. CHARLES R. HOWELL, COMMISSIONER OF BANKING AND INSURANCE OF NEW JERSEY, AND KENILWORTH STATE BANK, RESPONDENTS.

Argued March 21, 1967—Decided June 5, 1967.

*Mr. William P. Reiss* argued the cause for appellant (*Messrs. Pitney, Hardin & Kipp,* attorneys).

*Mr. Kenneth L. Estabrook* argued the cause for respondent Kenilworth State Bank (*Messrs. Lindabury, McCormick & Estabrook,* attorneys).

*Mrs. Marilyn L. Schauer,* Assistant Attorney General, argued the cause for Charles R. Howell, Commissioner of Banking and Insurance (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

JACOBS, J. An application for a charter for Kenilworth State Bank was filed with the Commissioner of Banking and Insurance pursuant to *N. J. S. A.* 17:9A–1 *et seq.* He granted the application above the objection of The National State Bank of Elizabeth, which appealed under *R. R.* 4:88–8 to the Appellate Division. We certified before argument there. *R. R.* 1:10–1(a).

The Borough of Kenilworth is in central Union County and is surrounded by the Townships of Union, Cranford and Springfield and the Borough of Roselle Park. Although there was an established branch of The National State Bank of Elizabeth in Kenilworth, some citizens of the community felt the need for a new bank to be run by local people with local interests primarily in mind. They discussed the matter among themselves and soon concluded that they ought to have assistance from people already in the banking field. They consulted Mr. Raymond Bauer, President of the Union County Trust Company, who joined with them in obtaining a preliminary feasibility study. Copies of the study were sent to the Department of Banking and Insurance and conferences were held thereafter with the Commissioner and his deputy.

At the initial meeting of the incorporators of the Kenilworth State Bank, Mr. Bauer explained that "if any director

or officer of Union County Trust Company were to become actively associated with the official family of this new bank it would be necessary under the regulations of the Federal Reserve Bank to have 51% of the issued Kenilworth State Bank stock owned by a group of stockholders who own 51% or more of the Union County Trust Company." He presumably had reference to federal legislation which prohibits any director, officer or employee of a member bank of the Federal Reserve system from being a director, officer or employee of any other bank, apart from stated exceptions including one where more than 50% of the common stock of both banks is owned by the same shareholders. See 15 U. S. C. A. § 19. All those at the meeting indicated their agreement that the Union County Trust Company shareholders should be offered 51% of the stock of the Kenilworth State Bank. At a later meeting of the incorporators, a nine-member board of directors was elected; five members of this board were also directors of the Union County Trust Company.

During the hearing before the Commissioner, it appeared that there would be common directorships to the extent aforestated and that more than 50% of the Kenilworth stock would be owned by individuals who owned more than 50% of the Trust Company's stock. It also appeared that the proposed chief executive of Kenilworth was a vice president of the Union County Trust Company. He was to resign his position with the Trust Company before undertaking his duties with Kenilworth. Kenilworth's plan was to hire only full-time executives and it was not contemplated that there would be any employees splitting their time between the two banks. There had been no discussion between the banks with respect to the transfer of any subordinate employees. It was anticipated that the Trust Company's computer system would be available to Kenilworth on the same basis as to other banks. Similarly, loan participation by the Trust Company would be available to Kenilworth on the same basis as to others.

In his decision on the application, the Commissioner dealt extensively with the evidence in the record supporting the findings required of him under paragraph D of *N. J. S. A.* 17:9A–11. He found that "the proposed institution will serve the public interest and that it affords reasonable promise of successful operation." He also found that the individuals who are to act as directors "possess capacity and fitness for their duties and responsibilities," and he made the other determinations called for by the statute. He formally approved the application for a charter for Kenilworth, stating that his action was predicated "on the premise that the bank will not merge, consolidate or sell to any other banking institution for the next five years, unless the Commissioner of Banking and Insurance, as the result of unusual circumstances, deems it so advisable." After the Commissioner had rendered his decision, the appellant requested reconsideration on the ground that, in view of the director and stockholder relationships between Kenilworth and the Trust Company, the granting of the application would be contrary to *N. J. S. A.* 17:9A–19. The Commissioner declined reconsideration, pointing out that the hearing before him had fully disclosed the extent of the common directorships and common stockholdings and that he had already considered those facts in reaching his determination that Kenilworth's application should be approved.

The appellant does not question the Commissioner's finding that a new bank in Kenilworth is economically feasible and in the public interest. As expressed in its brief, it "does not seek review of the Commissioner's decision in this regard, because it is recognized that the factual determination as to economic feasibility of a proposed bank is a matter properly left to the expertise of the administrative agency." See *Application of Howard Savings Institution of Newark,* 32 *N. J.* 29, 54 (1960); *Re Application of State Bank of Plainfield,* 61 *N. J. Super.* 150, 158 (*App. Div.* 1960). Its sole contention is that the establishment of Kenilworth as a so-called affiliate of the Union County Trust Company

was "a patent evasion of *N. J. S. A.* 17:9A–19" which prohibits a bank from opening a branch in another municipality where, as here, some other banking institution was already established there. See *In re Princeton Bank and Trust Co.,* 87 *N. J. Super.* 247 (*App. Div.*), certif. denied 45 *N. J.* 32 (1965); but see *Camden Trust Company v. Gidney,* 112 *U. S. App. D. C.* 197, 301 *F. 2d* 521 (*D. C. Cir.*), *certiorari* denied 369 *U. S.* 886, 82 *S. Ct.* 1158, 8 *L. Ed. 2d* 287 (1962); *First National Bank in Billings v. First Bank Stock Corporation,* 306 *F. 2d* 937, 942 (9 *Cir.* 1962); *cf. Whitney National Bank v. Bank of New Orleans & Trust Co.,* 116 *U. S. App. D. C.* 285, 323 *F. 2d* 290, 304 (*D. C. Cir.* 1963), reversed 379 *U. S.* 411, 85 *S. Ct.* 551, 13 *L. Ed. 2d* 386 (1965); see also 39 *N. Y. U. L. Rev.* 686 (1964); 16 *Stan. L. Rev.* 983 (1964); 8 *Vill. L. Rev.* 209 (1963); 110 *U. Pa. L. Rev.* 1158 (1962); *cf.* Handler, "Jurisdictional Abstention in Federal-State Branch Bank Conflicts," 19 *Rutgers L. Rev.* 445 (1965).

Branch, chain and group banking have long been the subject of discussion and controversy throughout the country. See *Chapman and Westerfield, Branch Banking,* Chapters 1 and 13 (1942); Note, "Branch, Chain, and Group Banking," 48 *Harv. L. Rev.* 659 (1935); *cf. Guttentag and Herman, Banking Structure and Performance, The Bulletin* (N. Y. U. Inst. of Fin.) February 1967; *Darnell, Chain Banking,* 3 *The National Banking Review* 307 (1966); Note, "Branch Banking in Utah," 9 *Utah L. Rev.* 372 (1964); Note, "Branch Banking: The Current Controversy," 16 *Stan. L. Rev.* 983 (1964). In our own State, various reports have been submitted by study committees to the Commissioner of Banking and Insurance and there has been much legislative activity including the introduction of many bills during the current legislative session. Before New Jersey's Banking Act of 1948 was enacted, branch banking was severely restricted to the municipality where the principal banking house was maintained (*R. S.* 17:4–14 amended by *L.* 1946, *c.* 315) although a branch outside the municipality could

lawfully be obtained through merger or consolidation. Notwithstanding the severe restriction on branch banking, chain banking was then fairly extensive and well-recognized in New Jersey. See "A Study of Group and Chain Banking," The Economic Policy Commission, American Banking Association, New York, *p.* 44 (1929).

 The distinctions between branch, chain and group banking are known generally in banking, legal and legislative circles. A branch is not a separate corporation or legal entity but is an office or agency operated by the legal entity which operates the main bank. It has no separate board of directors or capital structure, its deposits are pooled with those of the main bank, and its loan limits are based on the main bank's capital structure. A bank which is a member of a chain is an independent legal entity controlled by one or more individuals who control other independent banking entities through common stock ownerships, common directorships, etc. A bank which is a member of a group is an independent entity controlled by a company generally known as a holding company which also controls other independent banking entities. See *Garcia, Encyclopedia of Banking and Finance* 86 (*6th ed.* 1962) ; *Chapman and Westerfield, supra,* at *p.* 15 ; Note, *supra,* 48 *Harv. L. Rev.* 659, n. 1 ; Note, 32 *U. Chi. L. Rev.* 148, 149–152 (1964).

The Banking Act of 1948 represented a pragmatic compromise between competing interests in the banking field. See *Application of Howard Savings Institution of Newark, supra,* 32 *N. J.,* at *p.* 47. In that act the Legislature permitted the establishment of a branch, not only in the municipality where the principal office was located or elsewhere *via* merger as theretofore, but also where the branch was to be located within the county in another municipality where no other banking institution had "its principal office or a branch office." *L.* 1948, *c.* 67, *N. J. S. A.* 17:9A–19. Later legislation which eased the branch banking restrictions in additional respects was passed from time to time. See *L.* 1952, *c.* 179, *N. J. S. A.* 17:9A–23.1; *L.* 1952, *c.* 220, *N. J.*

*S. A.* 17:9A–19; *L.* 1953, *c.* 17, *N. J. S. A.* 17:9A–21; *L.* 1961, *c.* 67, *N. J. S. A.* 17:9A–23.9; *L.* 1963, *c.* 88, *N. J. S. A.* 17:9A–22.1; *L.* 1965, *c.* 171, *N. J. S. A.* 17:9A–19. Nowhere in the Banking Act of 1948 or in the later enactments did the Legislature deal specifically with chain banking. Nowhere did it curb common stockholdings by individuals or common directorships, although in 1957 it did legislate with respect to holding companies or group banking. *L.* 1957, *c.* 70, *N. J. S. A.* 17:9A–344 *et seq.; cf. L.* 1928, *c.* 273. While the 1957 legislation prohibited a company (as therein defined) holding 25% of the stock of a bank from acquiring more than 10% of the stock of another bank, it expressly excluded from its terms, acquisitions of stock resulting from bank mergers or consolidations. *N. J. S. A.* 17:9A–347. The appellant has not urged before us that Kenilworth's establishment was in violation of the 1957 anti-holding company legislation. See Phillips, "Bank Mergers, Branch Banking and Bank Holding Companies in Pennsylvania," 115 *U. Pa. L. Rev.* 560 (1967).

In the *Camden Trust* case, *supra,* the Court of Appeals for the District of Columbia had occasion to consider whether a new bank, affiliated with the Haddonfield National Bank through common stockholdings and directorships, was a branch within the contemplation of 12 *U. S. C. A.* § 36 which prohibits a national bank from establishing a branch where state law would not permit a state bank to establish such branch. The court held that the new bank "clearly is not a branch of Haddonfield but is a completely separate entity" with distinguishing features including an independent capital structure, fully subscribed and paid in stock, an independent name and separate business location, its own deposit liabilities and loan limitations, and its own board of directors. 301 *F. 2d,* at *p.* 524. The new bank's approval by the Comptroller of Currency was sustained with full awareness that all of the incorporators were directors of the Haddonfield Bank and that the Haddonfield stockholders, who later held all the stock of the new bank, had been

formally notified that the new bank would be an affiliate operating under the same management and policies. The court noted that "[i]f such an affiliate is to be denied status, Congress must clearly say so." 301 *F. 2d,* at *p.* 525.

In the *Billings* case, *supra,* the court rejected the contention that the Valley Bank, the stock of which was owned by First Bank Stock Corporation, a holding company which also owned the stock of the Midland Bank, was in fact a branch of Midland. It expressed the view that in order to establish that Valley was a branch it must be shown that "in substance, Midland is doing business through the instrumentality of Valley, or vice versa, in the same way as if the institutions were one." 306 *F. 2d,* at *p.* 942. It pointed out that it was not enough to show "common control, through stock ownership." And after reviewing the independent structures and characteristics of Midland and Valley respectively, it concluded that "the unitary type of operation characteristic of branch banking is not present. The mere fact that First Bank Stock has the power to cause Valley to function as if it were a branch of Midland is not enough." 306 *F. 2d,* at *p.* 943. *Cf. Whitney National Bank v. Bank of New Orleans & Trust Co., supra,* 323 *F. 2d,* at *p.* 303. See also *Whitney National Bank in Jefferson Parish v. James,* 189 *So. 2d* 430, 443 (*La. Ct. App.* 1966) : "The statute does not prohibit an affiliate relationship between banks in different parishes because an affiliated bank is neither a holding company subsidiary nor a branch bank."

When the *Camden Trust* case was before the federal courts, New Jersey's Commissioner of Banking and Insurance took the position that the Comptroller's approval of the new bank's charter should be upset. But the brief filed by New Jersey as *amicus curiae* in that case set forth that the Commissioner's opposition was not based "upon the single factor of affiliation" but on an appraisal of the full picture including, *inter alia,* "the fact that there would be identical boards of directors in each institution with identical management and identical policies." In its brief New Jersey also took

the position that "even assuming that so-called chain banking or bank holding companies do not violate New Jersey branch laws," the new bank should nonetheless be disapproved under the particular circumstances there presented. Be that as it may, we assume, as the appellant contends, that the Commissioner has in fact altered the sweep of his earlier opposition to the establishment of affiliated banks in areas where branch banking would be prohibited under *N. J. S. A.* 17:9A–19. This he could, of course, conscientiously do in view of the tenor of the court's opinion in *Camden Trust* and his own present conviction that a broader approach in bank affiliation cases is in the public interest and is not strictly violative of the statutory restrictions on branch banking. See *Alstate Construction Company v. Durkin,* 345 *U. S.* 13, 16, 73 *S. Ct.* 565, 97 *L. Ed.* 745, 749 (1953); *Association of Clerical Employees, Etc. v. Brotherhood of Ry. and S. S. C.,* 85 *F. 2d* 152, 156 (7 *Cir.* 1936); *cf. Safeway Trails, Inc. v. Furman,* 41 *N. J.* 467, 483–484, appeal dismissed 379 *U. S.* 14, 85 *S. Ct.* 144, 13 *L. Ed. 2d* 84 (1964).

▆▆▆ As in *Camden Trust,* Kenilworth may not properly be viewed as a branch of the Union County Trust Company. It is a separate legal entity with a separate capital structure and board of directors and with its own name, location, deposit liabilities, loan limitations, etc. Although majorities of its outstanding stock and directorships will be in the hands of stockholders and directors of the Union County Trust Company, very substantial minorities will be in independent hands. In any event, and as was spelled out in *Billings,* even full common stockholdings and directorships do not, without more, convert an affiliated bank into a branch bank. Constitutional issues aside, the Legislature could have but did not prohibit an individual from being a stockholder or a director in more than one bank. Nor did it adopt any enactment aimed specifically at chain banking resulting from such common stockholdings and directorships. In view of the well-recognized distinctions between chain and branch banking, the legislative restrictions aimed spe-

cifically at branch banking should not be extended by the judiciary to banks which are independently structured and operated though affiliated. If the Legislature wishes such extension it may adopt a suitable enactment; in the meantime we find that the grant of the charter for Kenilworth was not in violation of *N. J. S. A.* 17:9A–19. *Cf. Brundage v. The New Jersey Zinc Co.*, 48 *N. J.* 450, 472 (1967). Accordingly the action appealed from is in all respects:

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For reversal*—Justice HALL—1.