TITUS, C. J., and STONE and HO-GAN, JJ., concur.

**ST. LOUIS UNION TRUST COMPANY, a corporation, Appellant,**

v.

**H. Duane PEMBERTON (Successor to C. W. Culley), Commissioner of Finance of Missouri, Respondent,**

and

**St. Louis County National Bank, a corporation,**

and

**Clayton Bank, a corporation, Intervenors-Respondents.**

**No. KCD 26242.**

Missouri Court of Appeals, Kansas City District.

April 2, 1973.

Motion for Rehearing and/or Transfer Denied May 7, 1973.

---

Veryl L. Riddle, Thomas C. Walsh, and Eric V. Lemon, St. Louis, for appellant; Bryan, Cave, McPheeters & McRoberts, St. Louis, of counsel.

John C. Danforth, Atty. Gen., Michael L. Boicourt, Asst. Atty. Gen., Jefferson City, for respondent.

Lashly, Caruthers, Theis, Rava & Hamel, Clayton, for intervenor-respondent, St. Louis County National Bank; Albert H. Hamel, Clayton, of counsel.

Robert F. Schlafly, St. Louis, for intervenor-respondent, Clayton Bank; Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, of counsel.

Before DIXON, C. J., and PRITCH-ARD, SHANGLER, SWOFFORD and WASSERSTROM, JJ.

PRITCHARD, Judge.

Appellant sought from the Commissioner of Finance and by declaratory judgment

action in the circuit court the authority to establish an office in Clayton, Missouri, to be used in connection with its claimed exclusive trust business in downtown St. Louis, Missouri. Both the Commissioner and the circuit court denied the requested authority upon the basic proposition that it contravened the prohibition of Sec. 362.-105, subd. 1(1), RSMo 1969, V.A.M.S.: " * * * provided, however, that no bank or trust company shall maintain in this state a branch bank or trust company, or receive deposits or pay checks except in its own banking house or as provided in section 362.107." Sec. 362.107, as presently enacted, prohibits a bank or trust company from maintaining and operating separate and apart from its banking house, facilities for drive-in and walk-up service outside the city limits or county in which its banking house is located. St. Louis Union is not contending (and it is so stipulated) that its request in any way comes within the purview of Sec. 362.107.

The main thrust of St. Louis Union's appeal is that Sec. 362.105 is not applicable to it because it is a "pure" non-banking trust company (its Point II).

The facts are stipulated or come from answers to interrogatories. St. Louis Union was originally incorporated as a trust company in 1889, having as it principal place of business a building located at 510 Locust Street in St. Louis, Missouri. It is the largest trust company in this state, having assets in excess of 28 million dollars, and holding fiduciary assets in excess of 1 billion dollars. St. Louis Union originally exercised banking powers, as authorized by its charter (which charter provisions still exist), and through interim mergers and formation of new holding company entities, its present status came into being: The holding company, First Union, Incorporated, which was incorporated in 1968, thereafter acquired more than 97% of the outstanding shares of First National Bank in St. Louis, and more than 98% of the outstanding shares of St. Louis Union, the acquisition being accounted for

"as pooling of interests." Later purchases increased First Union's holdings. Although St. Louis Union does not presently exercise any "banking" powers, it is located in the same building with First National (a separate corporate entity which has no trust department) with common entranceways for public use, and the officers and employees of both use the same dining rooms, cafeterias and elevators. The same janitorial and maintenance services are provided both corporations. St. Louis Union borrows money for its own account and its fiduciary accounts from First National through which it also buys municipal and U. S. Government securities for itself and fiduciary accounts. The two corporations jointly advertise their services.

St. Louis Union's proposed office is 9 miles from its downtown location, and is at 222 South Meramec Avenue, in Clayton, Missouri, which is in St. Louis County. This proposed facility location is about 206 feet west of Intervenor Clayton Bank and about 642 feet south of Intervenor St. Louis County National Bank.

In pursuing its contention that it is not within the prohibition of "branching" within Sec. 362.105, St. Louis Union asserts (as a stipulated fact) that it is "engaged in 'trust and investment service exclusively.'" "Its activities are limited to those necessary and incidental to the business of being a fiduciary, and it is not in any sense of the word a 'bank'." The gist of the argument is that the reference to "trust companies" in Sec. 362.105 can only be reasonably interpreted to apply to trust companies which are engaged in the banking business and not to companies exercising trust powers exclusively, such as St. Louis Union. It relies on Sec. 362.010(3) which is: " '*Bank*' means any corporation soliciting, receiving or accepting money, or its equivalent, on deposit as a business, whether the deposit is made subject to check, or is evidenced by a certificate of deposit, a pass book, a note, a receipt, or other writing; * * *." As stipulated, St. Louis Union is one of only two financial institu-

tions in the City and County of St. Louis which do not make loans, receive deposits, pay checks, issue certificates of deposit, certify checks or issue cashier's checks. It cites Mercantile Bank v. New York, 121 U.S. 138, 159, 7 S.Ct. 826 (1887) for an enumeration of its *trust* functions, corporation agency functions, and for guardianships for the estate of infants. Undoubtedly, St. Louis Union, because of its *trust* functions as presently exercised, is not a "bank" in the sense of the above statutory definition, or in the commercial sense of that word. Upon that premise, it nevertheless argues that none of the problems which prompted the prohibition against branch banking exist in its trust business, e. g. protection of the public, lessening the risk of insolvency and probability of loss, and as stated in State ex rel. Barrett v. First Nat. Bank of St. Louis, 297 Mo. 397, 249 S.W. 619 (banc 1923), where appellant contended for its authority to establish a branch national bank at other than its regular place of business within the city of St. Louis, which authority was denied as being in violation of the (federal) laws of its creation and contravening the state statute prohibiting branch banking: "To render their act specific it must be confined to the terms of the statute, viz. to 'an office or banking house within the county, city or town' named in the articles. * * * Otherwise the words 'an office or banking house' ceased to be specific, and instead of being singular in number may be construed as plural, and thus permit the establishment of banks in as many places within the county, city, or town as the judgment of the directors may prompt. Such a construction finds no resting place in reason. If followed, it would, instead of centralizing and rendering more stable the powers of a bank, enable it, by multiplying its places of business, to subdivide and at the same time extend its powers in such manner as to stifle competition. Such an effect was certainly never contemplated by the Banking Act." [Loc. cit. 249 S.W. 621.] The Barrett case, in the quoted words, announced the public policy of this

state, also enunciated in Sec. 362.105 (and, as stipulated by the parties, pronounced by a vote of the people on an initiative petition on November 4, 1968, rejecting by a vote of more than two to one, a proposition for the establishment and operation of branches by banks, trust companies and national banking associations). By historical resumé St. Louis Union seeks to establish that this public policy, as definitively applied to banks, was never intended to apply to "pure" trust companies. For this purpose, St. Louis Union assumes, *arguendo,* that its proposed Clayton facility is a branch trust company.

It seems to be the historical argument that because of early banking difficulties and bank failures in the late 1800's branch banking was prohibited in the initial Act in 1899. In 1877 statutory regulation of banks of deposit and discount originated; but in 1885 incorporation of trust companies was permitted, but they were denied rights which were reserved to banks such as receiving money on general deposit, discounting and negotiating promissory notes, drafts or bills of exchange, and the buying and selling of coin or bullion. Trust companies "increasingly assumed the posture and performed the function of banks" and were in 1910 even defined as " 'a bank which has power to act in the capacity of trustee, administrator, guardian or executor' " [citing Barnett, State Banks and Trust Companies Since the Passage of the National Bank Act, Senate Doc. No. 659, Vol. 2, 1911]. The history is then traced as to the demise of the "pure" trust company, that is, the trust business became that of an adjunct of and a privilege of commercial banks. St. Louis Union concludes that by 1905 trust companies in Missouri were considered simply as banks with certain additional powers. At this point, in seeking to demonstrate that "pure" trust organizations are differentiated from banks (doing also a trust business), St. Louis Union cites State v. Reid, 125 Mo. 43, 28 S.W. 172 (1894). There the state sought to prosecute an officer

of a trust company for receiving a deposit knowing that the company was in failing circumstances. The court held that the penal statute, enacted in 1877, applied, as intended, only to banks, and not to trust companies the incorporation of which was first provided for in 1885. The court further referred to the "familiar rule of construction of criminal statutes * * * that they should be strictly construed, and not extended or enlarged by judicial construction so as to embrace offenses and persons not plainly within their terms." [Loc. cit. 28 S.W. 173] This is the distinguishing reason for that holding, and it in no way applies to the civil matter of the requested judicial construction here that banks having trust departments should be included as to the application of Sec. 362.-105 and trust companies doing an exclusive trust business not related to that of banking should be excluded. Seeking also an historical distinction between banks and trust companies, St. Louis Union cites State ex rel. Crow v. Lincoln Trust Co. et al., 144 Mo. 562, 46 S.W. 593 (1898). That decision was that four trust companies receiving deposits without paying interest thereon, and doing other "banking" business, exceeded their statutory powers, and should be ousted from the exercise of franchises not granted them. The authority denied the four trust companies in Crow was statutorily granted trust companies, along with other banking functions, in 1915. As pointed out by Clayton Bank, many years before 1915, trust companies had authority to exercise *many* banking functions, and the 1915 enactment could not have caused the then original prohibition against branching as to trust companies, or the limitation thereof as to trust business done in connection with bank activities.

◼ The increase of statutory supervision and regulation of trust companies, because of their similarities to the business of banking, is referred to by St. Louis Union as reason for excluding it from the operation of Sec. 362.105. The anti-branching legislation originally applied only to banks, and it was not until 1915 that trust companies were specifically mentioned in the statute granting expanded powers to those corporations: "Corporations may be created under this article for any one or more of the following purposes: 1. To receive money in trust and to accumulate the same, at such rate of interest as may be obtained or agreed upon, or to allow such interest thereon as may be prescribed or agreed, and to receive money on deposit, with or without allowing interest thereon, not exceeding in any case the legal rate: *Provided, however, that no trust company shall maintain in this state a branch trust company or pay checks except in its own banking house.* (There follows thirteen subdivisions of specific powers granted.)" [Italics added.] In none of the historical facts leading up to the foregoing prohibition against trust company branching can any rational basis be found for a legislative intent that it was aimed at banking, as distinguished from non-banking, trust companies. On the contrary, the legislative intent to prohibit trust company branching may be gathered from other statutes related to and culminating in the enactment of Chapter 362, RSMo 1969. Sec. 362.115 sets forth the procedure that a qualifying bank may add to its business the fiduciary powers granted to trust companies. Upon its application, the finance commissioner shall, in addition to other criteria, determine "The needs of the community for fiduciary services and the probable volume of such fiduciary business available to the bank; * * *." This section shows a legislative intent to control the proliferation of new trust departments of banks, which can be done only if there exists a need therefor in a context of whether existing fiduciary services, if any, are adequately providing such services. Although Sec. 362.105 does not expressly distinguish between a trust company doing banking business and one not doing banking business, Sec. 362.900 (in the chapter of which repealed all of Chapter 363 which related to trust companies) provides that Chapter

362 shall apply equally to banks and trust companies. It is also of significance that Sec. 362.107, relating to banking facilities separate from banking houses, provides in its subdivision 2(5), "Nothing contained in this section shall be deemed to authorize the maintenance or operation of a branch bank or a branch trust company in contravention of the prohibition contained in section 362.105." (The 1959 law referred to trust companies so prohibited in repealed Sec. 363.170.) In Sec. 361.230, relating to the Commissioner of Finance's approval concerning applications from a corporation authorized by law to open branch offices, the prohibition as a matter of intent is again set forth, " * * * [P]rovided, that this section shall not be construed to empower the commissioner to grant a certificate for any bank or trust company organized under the laws of this state to maintain in this state any branch bank or branch trust company." It is clear from the reading of Sec. 362.105 in its entirety, and notwithstanding that there is no prohibition against branching in its subsection 2 (by reason of which St. Louis Union argues that fiduciary services are not covered by the prohibition of subsection 1, which is, it says, limited to banking activities) that all banks, banks exercising trust powers, and trust companies not exercising banking powers, are intended, as an anti-monopolistic measure (State ex rel. Barrett v. First Nat. Bank of St. Louis, supra) to be covered. Media Title & Trust Co. v. Cameron, 289 Pa. 96, 137 A. 129 (1927), which granted branching authority to a trust company, is to be distinguished because there was no Pennsylvania law prohibiting a trust company from so doing.

If the plain wording of Sec. 362.105 were disregarded, and the construction given it for which St. Louis Union contends, the results could be these: Any bank now exercising also trust powers could separately incorporate its trust department and establish as many branches therefrom as "pure" trust business as it chose. St. Louis Union itself, after establishing its proffered branch, could start exercising its chartered banking powers, thus placing itself in the same position as those bank-trust organizations to which it contends Sec. 362.105 applies only, thus being able to do what the latter could not do. Each and every contention and argument under St. Louis Union's Point II are without merit, and the point is overruled.

■ By its Point I, St. Louis Union claims that its enumerated and proposed activities at the Clayton facility are not illegal because none of them would constitute the maintenance of a "branch trust company." It says that the statute prohibits only a branch trust company, and not merely a second office. It derives the contention from the claim that none of the true fiduciary activities or decisions will occur in Clayton, but will be done solely at the downtown office.

What St. Louis Union requested of the Commissioner of Finance was approval of its sublease of office premises at 222 South Meramec Avenue, Clayton, Missouri, for its intended use for these seven activities: (1) To interview and consult with prospective customers, their lawyers and representatives; (2) To consult with current customers, their attorneys and representatives, and to enable customers to deliver papers, documents and property in connection with trusts, estates and accounts being administered or to be administered; (3) To conduct, carry on and perform bookkeeping, record keeping, and auditing work and other functions of a similar nature incidental to the administration of estates and trusts; (4) To conduct and carry on and perform all operations in connection with acting as stock transfer agent and registrar for corporations and other business organizations and associations; (5) To conduct and carry on and perform all operations in connection with acting as paying agent or dividend disbursing agent for corporations, business organizations and associations; (6) To conduct and carry on a general real estate business, acting as agent for buyers and sellers and owners of real estate in the management, purchase and sale of proper-

ties; and (7) To conduct and carry on the business of giving investment advice with respect to the investment in and management of securities and property. St. Louis Union stated in its application to the Commissioner further: "No trust or estate assets, or any property belonging to customers will be held or retained at the Clayton premises. St. Louis Union Trust Company will not execute any trust instruments at the Clayton premises." The Commissioner denied the request upon the ground that the activities would be in violation of Sec. 362.105, with the exception of paragraph (3) above which would be granted only if it is established that such a facility is to be operated solely for carrying out the functions or the business of the trust company of an internal nature and will not be operated as a facility accessible to the public.

These facts are stipulated: St. Louis Union maintains a Probate Department, concerned almost exclusively with the administration of estates in which it is named as executor or administrator, and has a Probate Officer who takes possession of the estate, the personal property of which is kept in its vault. An inventory is prepared, tax estimates are made, and a determination is made as to sale of securities upon suggestion of St. Louis Union's Investment Department. The estate tax section of the Tax Department prepares estate and inheritance tax returns "in conjunction with the attorney for the estate," and also personal income tax returns are filed for the decedent's year of death, and fiduciary returns are filed thereafter for the estate. Semi-annual, annual and final settlements are prepared, and distribution is made. The employees of the Probate Department located in Clayton will be available to interview and consult with prospective customers and current customers, their lawyers and representatives. Papers, documents and property in connection with estate administration can be delivered by customers and potential customers at Clayton, but no estate assets or property will there be

retained, but will be promptly transmitted to St. Louis Union's downtown location. The inventory, tax returns, settlements and distribution schedules will be drawn downtown, but these documents might be delivered to the Clayton customer.

St. Louis Union's Personal Trust Department, wherein inter vivos or testamentary trusts in which it is named as a trustee are administered upon assignment to a trust officer, performs these functions: Physical possession of all trust assets are taken and distributions are made as required by the governing instrument. The Investment Department maintains a list of securities held, and makes recommendations concerning disposition or exchange of certain assets. Statements are given to co-trustees and beneficiaries by the Accounting Department each six months. The Income Tax Department files fiduciary returns, and the Estate and Gift Tax Department files gift tax returns if necessary. Again, at Clayton, employees of the Personal Trust Department will there be available to interview and consult with current and prospective customers, their lawyers and representatives, who will be able to deliver, receive and sign papers, documents and property in connection with trust, agency and other accounts being administered or to be administered. No trust assets or property will be retained in Clayton, and St. Louis Union will not execute any trust instruments at the Clayton location, and settlements, decisions, tax returns and distribution schedules will be maintained downtown.

The Pension Trust Department of St. Louis Union will have employees at Clayton available to consult with customers and potential customers. So also with employees from its corporate, real estate, investment and law departments.

In its argument, St. Louis Union urges that "a branch bank or trust company must be a separate viable entity" to run afoul of branching restrictions. It first cites Dean et al. v. Eastern Shore Trust Co., 159 Md.

213, 150 A. 797 (1930). It was said in the opinion, p. 799, that branch banks and branch trust company were permitted in Maryland. The issue was whether the parent corporation, Eastern Shore Trust Company, could recover for the cashing a check drawn on one of its branches, the South Dorchester Bank, when that branch informed another branch, the Cambridge Bank, that the drawer had sufficient funds to pay the check. Drawer then stopped payment on the check. The Maryland statutes contained no provisions "fixing or defining the incidents of the relationship between different branches of a single institution." Upon the rationale that the term "branch" as applied to such institutions as banking and trust companies implied the existence of an organization sufficiently complete to transact such business as is ordinarily done by a bank—such as discounting negotiable paper and receiving and pay deposits on demand, the court held at least for the purposes of the Negotiable Instrument Law, that the parent bank and its branch were to be regarded as separate entities, and Eastern Shore could maintain its cause of action against the maker of the check, because "Any other rule would not only lead to intolerable confusion and inconvenience, but would virtually destroy the value of the privilege which the state has given to banking institutions to establish branches." Next cited is Great Plains Life Ins. Co. v. First Nat. Bank of Lubbock, 316 S.W.2d 98 (Tex.Civ.App. 1958). In that case, lessor sought to cancel a lease of defendant bank upon the ground that it was operating a branch, prohibited by Texas statute, across the street from its main banking premises. The court held the leased premises, being merely a teller's facility, was a part of defendant bank. The court did say, loc. cit. 316 S.W.2d 104, "As we understand a branch bank it is a separate entity * * *," and cited and quoted from Marvin v. Kentucky Title Trust Company, 218 Ky. 135, 291 S. W. 17, 18 (1927), which before the enactment in Kentucky of Sec. 287.180, Ky.Rev. St., permitting branch banking, allowed the

establishment of bank offices in different parts of the city. In United States v. First National City Bank, 321 F.2d 14 (2nd Cir. 1963), the issue was whether the government could attach the alleged foreign delinquent taxpayers funds which were on deposit in Citibank's branch banks outside the United States. The court held there was no jurisdiction for the attachment of the funds outside the federal district because the branches were separate entities. Pan-American Bank & Trust Co. v. National City Bank, 6 F.2d 762 (2nd Cir. 1925), stands for the same proposition that a bank and its branch are separate entities as relating to business transactions between them concerning deposits and payment of checks. As suggested by the Commissioner, the theory of a lack of separate entity advanced by St. Louis Union in relying on the foregoing cases, is not applicable to the concept of corporate control of a main bank or trust company over its branch through capital stock holdings and a single board of directors. The Commissioner cites In Re Application of Kenilworth State Bank, 49 N.J. 330, 230 A.2d 377 (1967). In that case the issue whether the Commissioner of Banking and Insurance erred in granting a charter to the Kenilworth Bank in the face of the contention that it was a statutorily prohibited branch of the Union County Trust Company. The court held that it was not a branch, but was a separate legal entity with a separate capital structure and board of directors, and remarked (loc. cit. 230 A.2d 380 [1–3]), "A branch is not a separate corporation or legal entity but is an office or agency operated by the legal entity which operates the main bank. It has no separate board of directors or capital structure, its deposits are pooled with those of the main bank, and its loan limits are based on the main bank's capital structure. A bank which is a member of a chain is an independent legal entity controlled by one or more individuals who control other independent banking entities through common stock ownerships, common directorships, etc. A bank which is a member of a group is an inde-

pendent entity controlled by a company generally known as a holding company which also controls other independent banking entities." [The latter quoted sentence defines the status of First Union which, as stipulated, owns 99.75% of First National Bank in St. Louis; 99.62% of St. Louis Union; 98% of Bank of Springfield; 99.-17% of Vandalia State Bank; 98% of First National Bank of Cape Girardeau; 99.03% of First National Bank of West Plains; 98.83% of Rolla State Bank; 98.-50% of Crystal City State Bank; 98.55% of National Bank in North Kansas City; 100% of Roy Wenzlick Research Corp.; 100% of First Union Realty Management, Inc.; and 100% of First-Union Automation Services, Inc.] See also the definitions of "branch" in Webster's Third New International Dictionary, "a subordinate or dependent part of a central system or organization (a branch bank in a suburb)"; and in 12 U.S.C.A., Sec. 36(f), " * * * shall be held to include any branch bank, ·branch office, branch agency, additional office, or any branch place of business * * *." St. Louis Union is clearly the main trust company and its proposed Clayton facility will be but an office subordinately operated by it from downtown St. Louis, and under Kenilworth, supra, that office can only be a branch trust company prohibited by Sec. 362.105, and St. Louis Union's argument that it is not such must fail.

The doing of "trust business" is not solely confined to the administration of the assets of a trust or even the probate of an estate. It must of necessity include contact with existing and prospective customers, which the stipulation recites that St. Louis Union will do from all its major departments in Clayton, albeit that some of such departments do not perform strictly fiduciary functions. It is the *getting of business* that St. Louis Union contemplates. To do that it must hold itself out to prospective testators and settlors in Clayton that it can perform fiduciary functions. As pointed out by St. Louis County Na-

tional Bank, St. Louis Union has· in the past extensively advertised for such business, "The great thrust of all these [advertising] materials is essentially advice about the need for intelligent estate planning and the importance of having the advice and counsel of an experienced fiduciary, such as Appellant." Once the advertising becomes effective to induce .a customer to appear at the Clayton facility, undoubtedly the initial negotiations for the formation of a trust or the contents of a will (with or without a trust provision) include the ascertaining of the intention of the settlor or the testator in order to draft the instrument. Restatement, Trusts, 2nd, Sec. 4; 90 C.J.S. Trusts § 247, p. 225 et seq. The manifestation of the intention of the settlor or testator, at the time of the creation of the trust, is the beginning point. It is for this purpose that St. Louis Union, through its representatives, should and certainly must be present in Clayton if it is to get the business of administering the trust or probate of the will. This is the critical stage of the matter of fiduciary undertaking—"the evaluation, discussion and preparation of the estate plan before the document is written. This pre-document period may require several conferences with the testator, settlor beneficiaries, lawyer, trust officers and other representatives of the corporate trustee." (St. Louis County National Bank brief.) While it is true, in some instances, that a trust instrument must be signed by a corporate trustee— which St. Louis Union says it will do only at its downtown St. Louis offices, yet many things undoubtedly would be done (with St. Louis Union's representatives) by a settlor or testator at the proposed Clayton facility: besides conferences, the execution of the trust by settlor or testator, and its delivery to St. Louis Union. These prior acts cannot be separated from St. Louis Union's entire fiduciary business, and it is factitious for it to claim that maintaining a constant business contact office at Clayton and the activities to be carried on therein (with definite contact with the public) are "only of the most tan-

gential and peripheral nature." The isolated instances of customer interviews and property transfers taking place in their homes, which St. Louis Union correctly says would not constitute branching, differs vastly from the constant contact with customers in Clayton which St. Louis Union says it will do.

Kerens v. St. Louis Union Trust Company, 283 Mo. 601, 223 S.W. 645 (banc, 1920) is no help to St. Louis Union. It had no issue as to what constitutes the doing of trust business. American Guaranty & Trust Company v. Green, 282 A.2d 16 (Del.Super.1971), held only that the company which acted as a registrar and transfer agent for corporations had not been actively engaged in trust business since its incorporation in 1914, the certificate for which at that time authorized it to transact a general trust company business. The court ruled that American was entitled to a certificate to begin the transaction of business as a trust company under a statute defining its classification as being a corporation with trust powers actively engaged in non-trust business prior to 1933. The case had no issue as to the branching of a trust company. Hudson-Harlem Valley Title & Mortgage Co. v. White, 263 App.Div. 167, 33 N.Y.S.2d 592 (1942), held merely that under New York's Banking Act prohibiting banks and trust companies from transacting their usual business from other than principal offices, appellant could not carry on its banking and trust business outside the City of New York, yet there was no inhibition against doing its title business (under the supervision of the Superintendent of Insurance) outside the city. Leuthold v. Camp, 273 F.Supp. 695 (D.C.Mont.1967) held only that there was no prohibition against the maintenance of offices by banks wherever they chose so long as no banking business was conducted in them. Here the nature of St. Louis Union's proposed non-separable trust business at the Clayton office falls within the plain prohibition of Sec. 362.105, supra, and neither the Commissioner nor the trial court erred in denying approval of the proposed lease in Clayton for the purposes planned by St. Louis Union.

The judgment is affirmed.

All concur.

SOMERVILLE, J., not participating because not a member of the court when the case was submitted.